ERNESTINE M. MEHAN

*v.*

JAMES MEHAN *et al.*

*Opinion filed June 16, 1903.*

1. PLEADING—*defendant in chancery must set up his defense in his answer.* A defendant in a chancery suit must set up in his answer the defense he relies upon, and if the same is established the relief sought must be denied and the bill dismissed; but if he desires affirmative relief he must seek it by way of an original bill or a cross-bill.

2. PARTITION—*when it is error to grant affirmative relief in partition.* In partition by an infant heir against the other heirs it is not proper to admit in evidence an unrecorded deed to the defendants, not mentioned in the pleadings, and to decree title in them in accordance with such deed notwithstanding they filed no cross-bills.

3. SAME—*when it is not error to decline to apportion solicitor's fees in partition.* It is not error to refuse to apportion the complainant's solicitor's fees in partition where there is no evidence as to the value of the solicitor's services.

APPEAL from the Circuit Court of Cook county; the Hon. R. W. CLIFFORD, Judge, presiding.

This is an appeal from a decree of the circuit court entered February 6, 1902, in a partition suit brought by an infant heir seeking partition of two pieces of real estate in Hyde Park, Illinois. The titles to both lots had clouds upon them, and the bill sought the removal of these also. The two lots, with improvements, are described in the bill of complaint as lot 12, block 57, known

as the Jefferson avenue property, and lot 4, block 67, known as No. 5606 Lake avenue. The approximate value of the property is $25,000.

On December 13, 1900, Thomas Mehan died intestate. During his lifetime he was married twice. From the first marriage there were five children and one from the second, who is an infant and the appellant in this case. At the date of his death Thomas Mehan had no property of record in his name. His domestic life was unhappy. Each of his wives secured a divorce from him on the ground of cruelty. The title to lot 12 has been established by the decree in the heirs of Thomas Mehan, deceased. In 1890 he was the owner of this lot and in 1891 gave a mortgage on it. Part of the money thus raised was used in the purchase of lot 4. This mortgage was foreclosed in 1895, and by a master's deed the mortgagee, Edward Milan, secured the property, who held the record title until March 13, 1901, at which date a quit-claim deed from Milan to Mehan, and a trust deed from Mehan to William H. Milan, dated February 27, 1899, were then recorded. The original bill alleges this mortgage fictitious, but by an amendment thereto the answer of Edward Milan is admitted as true, and the trust deed securing notes for $4000 and interest, held by Edward Milan, are admitted to be a first lien on said lot 12. The exact condition of the title to this lot was thus brought to the attention of the court by the complainant and Edward Milan, mortgagee, so that in respect to this lot there is no controversy except on the allowance of solicitor's fees against it. The chief contention in this appeal centers on lot 4, block 67, known as the Lake avenue property. The evidence shows that the money raised on lot 12 by decedent was used in the purchase of lot 4. The record title to this lot was never in decedent. There is some evidence, however, tending to show that in 1899 he had this lot conveyed back to himself. The bill alleged that Thomas Mehan died seized of the property mentioned

therein, and that appellant and the five Mehans, who are appellees, were his only heirs-at-law, and that the title to the two properties was clouded by virtue of conveyances made to Edward Milan and to Ellen M. Clarkson, which conveyances it alleged were fraudulently made, for the purpose of defeating Thomas Mehan's wife, Elizabeth, in her suit for divorce and alimony. The court found title to lot 12 in appellant and appellees, subject to a mortgage to Milan of $4000, and found the title to lot 4 to be in the five Mehan children, the appellees, by virtue of the deed from Ellen M. Clarkson. After the announcement of the opinion of the court and before the formal decree, appellant entered her motion, supported by affidavits, for a rehearing, which the court overruled and entered a decree, and this appeal is prosecuted.

Appellant assigns eighteen grounds of error, but those mainly relied upon are the granting of affirmative relief to appellees on their answer and allowing them to avail themselves of the deed from Ellen M. Clarkson without the same being in any manner referred to in their answer or their answer in any manner setting up title in appellees for the property, for overruling the application for a rehearing, and for refusal of the chancellor to tax any part of the fee of appellant's solicitor as costs or apportion the same among the parties.

CHARLES G. MASON, for appellant.

EDWIN F. ABBOTT, for appellees.

Mr. JUSTICE RICKS delivered the opinion of the court:

The record in this case discloses that in 1890 Thomas Mehan, the ancestor, resided in Chicago on a tract described in the bill as lot 12. He then had a wife, Elizabeth, and six children. Five of these children were by a former marriage, and one of them, the appellant, was the issue of his second marriage by the wife Elizabeth, and was then about four years old. The marital relation

between him and Elizabeth was not pleasant. His former wife had been divorced from him, and there was such relation between him and Elizabeth as forecast a divorce proceeding on her part, and in order that he might continue to accumulate property and at the same time so shape his affairs that when the litigation between him and Elizabeth should come he would be better prepared to defeat her reasonable claim to a share of his property, he conceived and carried out the plan of purchasing the property known as lot 4, and in order to do so mortgaged the property in which he dwelt, being lot 12, and raised $6000 of the purchase price of lot 4 in that manner. He then negotiated the purchase from Martha Wellington, the owner of lot 4. The consideration paid for this lot is not clearly shown by the evidence, but the value of it is shown to be about $10,000. When the purchase was made he caused the conveyance from Martha Wellington to be made to his eldest son, James, but Thomas, the ancestor, took immediate possession of the property and leased and controlled it, and paid the taxes and assessments upon it until in October, 1892, when it appears that his marital relation became still more strained and legal proceedings more imminent. He then caused his son James to convey this property to Ellen M. Clarkson, who seems to have been a friend of his, and who, under the evidence, was holding the property under some sort of trust for his use and benefit. The consideration stated in the deed for this conveyance was $10,000. The evidence is not clear in point of time, but it shows that some time after acquiring this lot 4 Thomas Mehan moved into the property and continued to occupy it thence until his death. It shows that he paid the taxes and assessments on this property during the years 1890, 1891, 1898, 1899 and 1900; that he and his wife, Elizabeth, a short time before the time of the conveyance to Ellen M. Clarkson, separated, and that she afterwards brought suit for separate maintenance, and, pending suit, amended her bill,

praying for divorce upon the ground of cruelty, and in December, 1898, obtained a decree for divorce and alimony. During the time of the separation and until the obtaining of the divorce by Elizabeth from him, Ellen M. Clarkson, in whose name the property stood, appears to have paid the taxes, but before the separation and after the divorce Thomas Mehan paid the taxes. During all the time he had control of the property and substantially all the time he lived in and occupied a portion of it, and what was done in the name of Ellen M. Clarkson in reference to payment of taxes, insurance, etc., during the struggle between Thomas Mehan and his wife, was done principally by Thomas Mehan, he using care during that period to state that he was acting as her agent. At the time James Mehan made the deed to Ellen M. Clarkson, she made and delivered to Thomas Mehan a quit-claim deed for the expressed consideration of one dollar, conveying lot 4 to Mary E., Katy, Thomas, Alice and James Mehan, the five children of Thomas Mehan by his former wife, which deed was never recorded and is not shown to have been delivered by James Mehan to any of the grantees therein named. There is also evidence tending to show that after the divorce proceeding had ended, Ellen M. Clarkson made a deed of these same premises to Thomas Mehan. Lot 12 above referred to was the home of Thomas Mehan at the time he borrowed the $6000 to buy lot 4. This money was borrowed of one Milan, and when the trouble came on between Thomas Mehan and his wife, Mehan permitted the mortgage given to be foreclosed and a master's deed to be issued to Milan, but after the divorce proceedings had ended Milan quit-claimed or conveyed back to Thomas Mehan the same property and took a mortgage for the amount of the original loan remaining due. Neither the mortgage nor the quit-claim deed was recorded, but they were held in secret until after the death of Thomas Mehan, and their existence was first disclosed by the answer of Milan,

when the bill was amended according to the facts disclosed. Thomas Mehan died intestate December 13, 1900, and left the five children named as grantees in the quitclaim deed above mentioned, and also appellant, as his only children and heirs-at-law.

Appellant's bill for partition charges that these conveyances, through James Mehan to Ellen M. Clarkson, of the property bought by Thomas Mehan, being lot 4, was to defraud Elizabeth Mehan and the creditors of Thomas Mehan. This allegation was not denied in any of the answers and is expressly admitted of record by appellees, and seized upon by them as a ground which would preclude the right of appellant to maintain the bill. Appellees invoke the rule that a fraudulent conveyance to defeat the claims of creditors is binding alike upon the grantor and those claiming under or in privity with him, and that equity will not grant relief from such conveyance,—and such is unquestionably the rule. It has been announced by most of the courts in this country and in England and has long been the rule of this court. The rule is founded in a wise public policy, and is designed as one of the most effective means by which the law seeks to prevent fraud and to enforce the observance of honesty and good faith, and furnishes an example of the very rare instances under our jurisprudence wherein the sins of the father are visited upon his children. In the case at bar, the purchase of lot 4 in question with the moneys of Thomas Mehan and the taking of the title in his son James would, without the taint of fraud, operate as a resulting trust, and the children of Thomas Mehan would have been entitled to enforce and have the benefit of such trust. There is no question, under this evidence and the admission of counsel, but that Thomas Mehan exercised dominion over this property and controlled every movement and disposition of it from the time he negotiated for its purchase to the time of his death, and the record abundantly shows, if effect is to be given to his

acts, that he had the dual purpose of defrauding his wife of her proper allowance in case of a divorce proceeding and to prevent her progeny from in any manner becoming the beneficiaries in the property. Looking at the situation from the standpoint of morality and justice, as commonly accepted, it seems a hardship that appellant, whom Thomas Mehan, because she was the child of a wife that he despised, through a fraudulent means common to both seeks to deprive of any interest in his property, should be held, in law and equity, in privity with his estate and bound by his acts. But the law must be general in its application, and when once established it is better for the interests of society that its rules be adhered to, even though there may be occasional instances where hardship is wrought.

It seems most unjust and inequitable that the son James, who was a co-conspirator and an active instrument in carrying out the fraud of his father, should after its consummation be permitted to stand in the attitude of an innocent party and enjoy even more than his full share of his father's estate. But if it be true and the evidence shall fully disclose that Ellen M. Clarkson received title to the property for the fraudulent purposes alleged, and that, being such holder of the title, she conveyed the same to the five appellees, children of Thomas Mehan by his first wife, and that that deed became effective, the law is powerless to aid the appellant in the matter; and though it may be said that Ellen M. Clarkson, notwithstanding the fraud, continuously recognized the right of Thomas Mehan in the property, as evidenced by the conveyance to his children at his dictation, or as further evidence, as the record tends to show, by a deed to himself, still, if the deed to his five children became effective it must be given force, and what must be presumed to have been his wish in the disposition of his estate, as against his children, is in the eye of the law supreme. As has been repeatedly said, the property

passing from the father to the child is not a matter of
right, but is the bounty of the father, which he may give
to all alike or withhold from any or all, as he pleases.
If, on the other hand, it should appear that the deed
to the five children was not so delivered that it became
operative, and if it should further appear that after the
termination of the divorce proceedings a deed by Ellen
M. Clarkson was made and delivered to James Mehan
for these premises, then the appellant was entitled to a
share thereof.

The disclaimer filed by Ellen M. Clarkson would es-
top her from asserting title to the property as against
appellant, but would not have the effect of canceling
the deed or legal title that stood in her if the title was in
fact in her at the time of filing the disclaimer, nor would
it vest the title in appellant or the heirs of Thomas Me-
han.   It would operate against Mrs. Clarkson as an es-
toppel, but if, upon the proof, it appeared that the legal
title was in fact in her, and it became necessary, in order
to vest the title in the heirs of Thomas Mehan, to enter
a decree canceling or setting aside that deed, then equity
would refuse to proceed, because the title was in her
through the fraud of Thomas Mehan, the ancestor, and
he being barred of any remedy, at law or in equity, by
virtue of that fraud, his children and heirs, who stand
in his place, would be alike denied the necessary relief.

This case will be reversed because of errors in the
decree and procedure.   When appellant filed her bill the
appellees answered.   Ellen M. Clarkson filed a full and
formal disclaimer of all manner of right, title and inter-
est whatsoever in and to any of the premises in the bill
of complaint mentioned.   Two of the appellees, Thomas
and James Mehan, answered, denying that Thomas Me-
han was the owner of the premises and that appellant
was his child and heir.   Three of the appellees, Alice,
Catherine and Mary Mehan, answered the bill, neither
affirming nor denying the allegations of the bill, but call-

ing for proof thereof. No answer in any manner set up title in the premises in appellees, nor did any answer make the slightest reference to the deed from Ellen M. Clarkson to them. None of them filed a cross-bill or asked for any relief, and yet the chancellor, upon the hearing, found that each of appellees was the owner of an undivided one-fifth interest in said lot 4 by virtue of the deed from Ellen M. Clarkson to them, and also expressly decreed and fixed such title in them. It is a well recognized principle of chancery that a defendant, by his answer, must set up the defense he relies upon. (*Kehm* v. *Mott,* 187 Ill. 519; *Jewett* v. *Sweet,* 178 id. 96; *Dorman* v. *Dorman,* 187 id. 154; *Crone* v. *Crone,* 180 id. 599; *Johnson* v. *Johnson,* 114 id. 611; *Home Ins. Co.* v. *Myer,* 93 id. 271.) The rule seems to be, that in equity a defendant may rely in his answer upon any matter which shows that the complainant is not entitled to the relief he claims in his bill, and if he succeeds in establishing such defense there must be a denial of the relief sought and a dismissal of the bill. The defendant is not, however, permitted to go further than to defeat the complainant. He can use his answer for the purpose of defense but not for the purpose of obtaining relief on his part. If he seeks affirmative relief he must seek it by way of original bill or cross-bill. *Tarleton* v. *Vietes,* 1 Gilm. 470; *Ballance* v. *Underhill,* 3 Scam. 453; *Shields* v. *Bush,* 189 Ill. 534; *White* v. *White,* 103 id. 438; *Mason* v. *McGirr,* 28 id. 322; *Gorham* v. *Farson,* 119 id. 425.

In *Mason* v. *McGirr, supra,* a bill was filed to declare certain deeds obtained by one Tilden fraudulent and set them aside. Answers were filed denying the material averments in the bill and insisting upon the validity of Tilden's title. The decree was that the bill be dismissed, that the complainants pay the costs and that the title to the undivided two-thirds of the premises be confirmed in Tilden. Upon the proposition that relief should not have been granted without a cross-bill this court said (p. 324):

"The practice has been long and uniformly settled, and it must be regarded as the established practice of this court, that such relief can never be given unless it be on bill or cross-bill praying relief. (Citing authorities.) In such cases, all the court can do is to refuse the relief sought and dismiss the bill, leaving the defendant, if he have equitable rights, to pursue them in an original suit. If this decree were to remain in force it would operate as a bar to a recovery in ejectment, notwithstanding the complainants might establish an indisputable right of recovery outside of the grounds relied upon in the bill. It would be unjust to cut off their rights by decreeing that Tilden had an indefeasible estate in the premises, without permitting complainants to controvert the fact by answer and proof."

As to the importance of the rule that the defense should be set up in the answer, the case at bar presents a strong illustration. As we have said, none of the answers of the appellees asserted title in themselves in any manner. But one of appellees testified, and that was Thomas Mehan, Jr., and in reference to an unimportant and immaterial matter. After complainant had rested, counsel for appellees produced and offered in evidence the deed made in 1892 by Ellen M. Clarkson and husband to the appellees, the Mehans. He then put upon the stand the notary, Charles W. Greenfield, who took the acknowledgment and was present at the execution of the deed, who testified that at the time it was made it was delivered either to James Mehan, one of the appellees, or to Thomas Mehan, the ancestor, his best recollection being that it was delivered to Thomas Mehan. This was all the evidence in the record as to the execution or delivery of this deed. The evidence does not disclose that at the time it was delivered to Thomas Mehan he received it as the agent of appellees, or that the grantor in the deed gave any direction or said anything whatever about it. Unless Thomas Mehan was

acting for the grantees in the deed and the delivery to him was for them, then there is no evidence whatever of any delivery of this deed, and the absence of all reference to it in the answers of appellees strongly indicates that they neither knew of nor relied upon it at the time they did answer. Ellen M. Clarkson was not a witness. James Mehan was not a witness. In fact, no one who had any knowledge pertaining to that deed from the moment of its execution and delivery to Thomas Mehan to the time of trial testified at all. Appellant was placed in an unfair attitude by the reception of this evidence, of which she had no knowledge, and, so far as the record shows, no possible means of knowledge; and upon this deed, with no other evidence to support it than we narrated above, the court proceeded, upon the answers, which claimed nothing, and without any bill or cross-bill asking for any relief whatever, to both find and decree the title to this lot 4 in appellees, the five Mehan children.

It is also urged that the court erred in refusing to apportion the appellant's solicitor's fees among those found by the decree as legally entitled to lot 12, of which partition was decreed. Appellees contend that this was properly refused by the court for the reason that the original bill did not correctly set forth the title. The original bill did correctly set forth the title so far as the same appeared of record, and declared the title to lot 12 to be in Milan, who was made a party. After the bill had been filed, the deed from Milan to James Mehan, and the trust deed from Thomas Mehan to Milan, made in 1899 and after the determination of the divorce proceedings, were placed of record, and Milan filed his answer denying that he held the title and stating his interest to be that of a mortgagee, and further disclosing the fact for the first time, so far as appellant was concerned, of the making of the deed to Thomas Mehan and of the mortgage by Mehan to Milan. When that disclosure was made the bill was properly amended, truly setting forth

the title.  In this there could have been no possible injury to the appellees, the Mehans.  Nor was it any reason for their employing counsel to protect their interests.  Nor was it upon any disclosure made by them that the amendment was made and the title correctly shown by the bill.  So far as the five Mehan children, who are appellees, are concerned, there was nothing disclosed in any of their answers that tended to show that there was a real or meritorious defense, and when Milan disclosed the fact of the deed and mortgage on lot 12, and appellant amended her bill, all the proceedings with reference to lot 12, after that, were amicable and by agreement.  There was no contest about it.  The same may be said of lot 4.  No answer disclosed and nobody told that the title to lot 4 was different from that stated in the bill, until complainant rested her case, when counsel for the other Mehan children produced an unrecorded deed from Mrs. Clarkson to them.  There is no claim, either by the evidence or pleadings, or anything else in this record, that any of these matters were within the knowledge of appellant or that it was possible for her to further set out the title than she had done.  So much of the solicitor's fees as related to the partition of lot 12 should have been apportioned between the parties in interest in that property had there been sufficient evidence before the court as to the value of such services to have warranted it, but as there was no evidence adduced before the court as to the value of the services of appellant's counsel, it was not error for the court to refuse to apportion the fees or tax any portion of them as costs.

For the reasons stated above, the decree of the circuit court will be reversed and the cause remanded, when such amendments as may be necessary may be made to the pleadings and such proceedings had as the nature of the case and equity may require, consistent with the views herein expressed.　　　　*Reversed and remanded.*